## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT

I, Federal Bureau of Investigation Task Force Officer Michael McGee, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I am employed as a police officer with the Manchester, New Hampshire Police Department and have been so since July 2014. I am currently a Federal Bureau of Investigation (FBI) Task Force Officer (TFO) for the New Hampshire Major Offender Task Force, which works to dismantle and disrupt criminal organizations and streets gangs in and around the state of New Hampshire. I have been assigned to this task force since March of 2021. Prior to joining the task force, I was assigned to Manchester Police Department's Anti-Crime Unit where I focused on the deterrence and apprehension of violent offenders with a special emphasis on criminal street gangs. I was assigned to the Anti-Crime Unit between November 2021 and March 2021. Prior to joining the Anti-Crime Unit, I was assigned to the Gang Prevention Unit where I strictly focused on criminal street gangs within the city of Manchester. My duties within the Gang Prevention Unit consisted of apprehension, deterrence, and intervention of individuals associated with criminal street gangs. I was assigned to the Gang Prevention Unit in June 2017.

2.       During my employment as a police officer, I have successfully completed the Manchester Police In-House Academy as well as the New Hampshire Police Standards and Training Council Academy located in Concord, New Hampshire. I have received specialized investigatory training in numerous areas to include, gang investigations, drug investigations, criminal interdiction, and I am a certified Professional Gang Investigator by the East Coast Gang Investigators Association. I have responded to, investigated, or participated in the investigation

of many crimes to include homicides, aggravated assaults, robberies, burglaries, thefts, and drug related crimes. I have a Bachelor of Arts in Criminal Justice from Saint Anselm College in Manchester, New Hampshire. In my current assignment I have tracked, interviewed, and investigated various persons, and otherwise spoken with several persons involved with gangs, violent crimes, and drug trafficking. I have received hundreds of hours of training in the field of narcotic investigations and enforcement. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

3.        I have participated in all aspects of drug investigations, including physical and electronic surveillance, undercover investigations, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.        Through my training, education, and experience, I have become generally familiar with the way drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, laundering illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. I have participated in the execution of numerous search warrants resulting in the

seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, money, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests.

5.      I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a.    my experience investigating drug-trafficking offenses

    b.    oral and written reports and documents about this investigation that I have received from members of the Manchester Police Department (MPD), Drug Enforcement Administration (DEA), and the Federal Bureau of Investigation (FBI);

    c.    discussions I have had personally concerning this investigation with experienced narcotics investigators;

    d.    physical and fixed camera surveillance conducted by the DEA, FBI and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

    e.    public records and law enforcement databases;

    f.    telephone toll records, pen register and trap and trace information, and

telephone subscriber information; and

      g.    geolocation information.

6.    Because this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of certain search warrants, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

7.    I submit this affidavit in support of an application for a warrant to search the following SUBJECT PREMISES believed to be occupied, controlled or used by members of the SOTO BAEZ Drug Trafficking Organization (DTO):

    a.    21 Chamberlain St., 3rd Floor, Boston, Massachusetts (SUBJECT PREMISES-1 (hereafter, "**SP-1**")), as described in Attachment A-1;

    b.    15 Shepton St., Apartment 1, Boston, Massachusetts ("**SP-2**"), as described in Attachment A-2;

    c.    98 Millet St., Apartment 1, Boston, Massachusetts ("**SP-3**"), as described in Attachment A-3;

    d.    11 Abbot St., Apt 1, Boston, Massachusetts ("**SP-4**"), as described in Attachment A-4; and

    e.    7 Everett Ave Apt 1, Boston, Massachusetts ("**SP-5**"), as described in Attachment A-5.

8.    Based on the information contained herein, there is probable cause to believe that each of these SUBJECT PREMISES, **SP-1**, **SP-2**, **SP-3**, **SP-4**, and **SP-5**, contains evidence of

the identification of individuals who are engaged in the commission of, and evidence, fruits, and instrumentalities (as further described in Attachment B) of, the following Target Offenses: 21 U.S.C. § 841(a)(1) [Possession with the Intent to Distribute and the Unlawful Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 21 U.S.C. § 843(b) [use of a communication facility during or in relation to a controlled substances trafficking offense].

## PROBABLE CAUSE

### *Confidential Sources*

9.      Agents of the FBI, DEA, and MPD have received information concerning the illegal drug trafficking activities of the SOTO BAEZ Drug Trafficking Organization ("DTO") from multiple confidential sources. Pertinent to this affidavit, agents have received information from five confidential sources (CS-1, CS-2, CS-3, CS-4, and CS-5) regarding the drug trafficking activities of this DTO.

**CS-1**

10.      CS-1 has been cooperating with law enforcement since approximately June 2022. Prior to agreeing to cooperate with law enforcement, CS-1 was arrested while attempting to purchase crack cocaine on two occasions. In exchange for possible lenient treatment with respect to those charges, CS-1 agreed to cooperate with law enforcement officers and provided them with information about various drug traffickers. Since becoming a cooperating witness, CS-1 has utilized controlled substances on one occasion, and CS-1 admitted to the violation shortly thereafter. CS-1 has provided information related to criminal activity which has been corroborated by law enforcement and other witnesses – specifically, the identification of individuals distributing controlled substances. CS-1 has continued to work so as to receive

favorable treatment regarding pending or potential charges, but since the end of 2022, has also

been financially compensated due to the longevity of CS-1's work and the intelligence provided

to law enforcement. Although CS-1 has committed criminal violations since becoming a

cooperating witness, law enforcement still believes CS-1 to be a credible source of information,

and the drug transactions CS-1 engaged in have been confirmed by surreptitious recordings. CS-

1 has convictions for driving related offences and possession of controlled substances [F] (NH

RSA 318-B:2, I).

     11.    CS-1 identified persons CS-1 personally knows to be involved in the illegal sale

of controlled drugs within the city of Manchester and provided the following information: CS-1

informed MPD detectives that CS-1 has been purchasing cocaine, crack cocaine, and

heroin/fentanyl from a male CS-1 knew as "Ricky." Through a previous investigation, I know

that "Ricky" is believed to be Juan Ramon SOTO BAEZ. As a result of the past investigation,

SOTO BAEZ has outstanding warrants for six counts of sale of a controlled drug. According to

CS-1, over the past couple of years, Ricky's organization has grown bigger and he decided to

organize three different "teams." CS-1 stated that one team handles the smaller quantities of

distribution, while the other two teams handle the larger quantities. CS-1 stated that one of the

teams is run by "Angel and Julio," and another team is run by "Ralphie." CS-1 was unsure of

who was in charge of the third team. CS-1 stated that CS-1 used to call Ricky directly but instead

calls Ralphie with anything CS-1 needs. CS-1 stated that when CS-1 calls Ralphie, Ralphie will

then call a runner to meet CS-1. CS-1 stated that CS-1 has met Ralphie as well. . According to

CS-1, CS-1 also meets runners in different areas of the city, and typically entersone of the

runner's vehicles, conduct the transaction within the confines of the vehicle, and then exit.

**CS-2**

12.     CS-2 has been cooperating with law enforcement since approximately April

2022. Prior to agreeing to cooperate with law enforcement, CS-2 was arrested for purchasing and

possession of heroin/fentanyl. In exchange for possible lenient treatment with respect to those

charges, CS-2 agreed to cooperate with law enforcement officers and provided them with

information about various drug traffickers. Since becoming a cooperating witness, CS-2 has been

arrested for resisting arrest or detention on one occasion. CS-2 admitted to this violation.

Additionally, on February 8th, 2023, CS-2 was stopped by Manchester PD, and officers observed

what they believed to be signs of drug activity. MPD officers ultimately seized CS-2's vehicle.

CS-2 admitted to the handling officer that there was approximately four grams of heroin/fentanyl

inside of the vehicle, which was confirmed by a search warrant executed on the vehicle. CS-2 was

counseled regarding this conduct. CS-2 has not been arrested and is not facing charges in

connection with this conduct. Despite the above, CS-2 has provided information related to

criminal activity which has been corroborated by law enforcement and other witnesses,

specifically, the identification of individuals distributing controlled substances. Although CS-2

has committed criminal violations since becoming a cooperating witness, law enforcement still

believes CS-2 to be a credible source of information, and the drug transactions CS-2 engaged in

have been confirmed by surreptitious recordings. CS-2 has convictions for Possession of a

Controlled Drug [F] (NH RSA 318- B:2,I), Simple Assault [M] (NH RSA 631:2-a), Theft by

unauthorized taking [M] (NH RSA 637:7), Criminal Trespassing [M] (NH RSA 635:2), and

Carrying a weapon without a license [M] (NH RSA 159:4).

13.     CS-2 identified persons CS-2 personally knows to be involved in the sale of

various controlled drugs within the city of Manchester and provided the following information:

CS-2 stated that CS-2 would buy crack cocaine from "Angel." At the time of the debrief with CS-2, investigators were aware that Angel was part of a dispatch crew that operated in Manchester run by "Spanish Ricky", whose real name is Juan Ramon SOTO BAEZ. SOTO BAEZ has outstanding warrants for the sale of a controlled drug. Since the previous investigation resulting in those warrants, "Ricky's" organization had grown. Investigators learned in the course of the investigation that "Ricky" utilizes three teams to facilitate dealing narcotics throughout the city. Two of the three teams deal large quantities, while the third team deals with smaller quantities. One of the teams is run by a male known as "Ralphie," another team is run by "Angel," and the third team leader wass unknown to investigators at the time of the interview with CS-2. CS-2 advised that CS-2 has only dealt with Angel. CS-2 provided a phone number for Angel of 603-852-6530. CS-2 advised that CS-2 will call "Angel" and tell him what CS-2 needs. Angel will then direct CS-2 to an intersection and dispatch one of his runners to facilitate the deal with CS-2. CS-2 advised during the debrief that CS-2 typically would get into the runner's vehicle and conduct the hand to hand drug transaction within the vehicle. CS-2 explained that Angel's runner has only driven a black SUV to facilitate the deals with CS-2. CS-2 stated that so far, Angel's runner has been the same person for every meet/deal. CS-2 stated that when CS-2 first met with "Angel's" runner, that the runner explained to CS-2 that the organization has lawyers, state employees, and local police throughout various departments on their payroll. The runner further explained to CS-2 that the reason these people were on the payroll was to tip them off and let them know when a police investigation was initiated into their organization.

**CS-3**

14.    CS-3 had been working with law enforcement since 2022. CS-3 agreed to cooperate with law enforcement and provide information about various narcotics traffickers in

exchange for financial consideration. Since becoming a cooperating source of information, CS-3 has been arrested for a driving related offense. CS-3 admitted to the offense shortly thereafter. CS-3 has provided information related to criminal activity which has been separately corroborated by law enforcement and other witnesses, specifically the identification of individuals distributing controlled substances. CS-3 has participated in other drug-related investigations, and CS-3's information has been independently verified by law enforcement. CS-3 provided law enforcement information regarding a Dominican male, whom CS-3 only knew as "Carlos," believed by investigators to be Flemin SOTO BAEZ.

15.     CS-3 explained that CARLOS (Flemin SOTO BAEZ) ran a "drug delivery service" within the city of Manchester, New Hampshire. According to CS-3, CARLOS had multiple individuals working for him for the purposes of distributing varying quantities of narcotics. CS-3 said CARLOS acted as the call-taker and was responsible for inquiries regarding specific drug transaction(s) and their subsequent meet location(s). CARLOS would dispatch a runner to the meet location and the runner would complete the drug transaction on behalf of CARLOS. According to CS-3, he would receive a call from CARLOS to notify CS-3 about his driver's impending arrival to the meet location. CS-3 would enter the runner's vehicle and complete the transaction inside. CS-3 stated the narcotics were prepackaged and kept inside a large cup near a bottle of water. According to CS-3, he  purchased crack cocaine from CARLOS and his runners for approximately four months. CS-3 identified two runners who distributed narcotics on behalf of "CARLOS." One runner was known to CS-3 as "Manny," who was later identified as Victor ARIAS MEJIA by an investigator who witnessed him driving the vehicle involved in a controlled purchase conducted in the course of this investigation, and recognized him based on a prior drug investigation. The second runner was known only as "John," believed

to be Jose CORDERO ORTIZ. CS-3 was aware of a third associate, primarily associated with "Manny," identifying him as "Angel." CS-3 identified the telephone number 603-377-6466 as being associated with "CARLOS."

**CS-4**

16.     CS-4 has been cooperating with law enforcement since approximately 2021. CS-4's cooperation with law enforcement is motivated solely by monetary compensation: CS-4 does not have any open charges, nor is CS-4 cooperating for the purpose of seeking leniency on charges. CS-4 has provided information related to criminal activity that has been corroborated by law enforcement and other witnesses – specifically, the identification of individuals distributing controlled substances. CS-4 has not been arrested since cooperating with law enforcement. Law enforcement believes CS-4 to be a credible source of information, and the surreptitious recordings conducted by CS-4 accurately capture evidence of criminal activity by others. CS-4 has convictions for Sale of a Controlled Drug (NH RSA 318-B:2).

17.     CS-4 identified a subject who CS-4 personally knows to sell crack cocaine, as well as other illegal drugs as: "Tony" aka "Peter" with telephone number 603-233-4047. CS-4 stated that CS-4 knew Tony for approximately one and a half months, and described him as a shorter, stalky Hispanic male in his mid-30s, with a clean cut appearance. CS-4 stated that CS-4 would normally place a phone call into "Tony," at which time either "Tony" or another Hispanic male would arrive at CS-4 's location and sell CS-4 quantities of crack cocaine. CS-4 stated that although there have been several "runners" delivering the product, CS-4 found that most often, the male who answers the phone when CS-4 calls is the one who delivers the product. CS-4 stated that Tony drives a red SUV;and other runners drive the same red SUV. CS-4 stated that Tony usually sells "half balls" (1.75g) of crack for $100. CS-4 stated that on one occasion, when

Tony arrived to sell the product, CS-4 observed Tony seated in the driver's seat of the vehicle, reaching down toward the side of the center console. CS-4 stated that CS-4 believed Tony was retrieving the product from an interior hidden position within the vehicle. CS-4 stated that Tony typically would enter the location where CS-4 was, and "hang out" until another call came in. From there, Tony would then leave and drive to his next customer. CS-4 knows that Tony and his runners work in shifts, and that Tony drives up from Boston every day to then get into the red SUV and begin making deliveries.

**CS-5**

18.     CS-5 is cooperating with law enforcement in exchange for possible leniency regarding charges for operating without a valid license and suspension of motor vehicle registration brought by the Hillsborough, New Hampshire Police Department. CS-5 was also in possession of a small quantity of crack cocaine and heroin/fentanyl in 2023 but has not been charged for this conduct and is anticipated to work so as to receive leniency on any potential charges  associated with this conduct. It is the belief of law enforcement that despite CS-5's illicit use of narcotics in 2023, while being a confidential source, CS-5 has been credible, and CS-5 has also provided corroborated intelligence. CS-5 has not been paid while cooperating with the Manchester Police Department. CS-5 has not been arrested since being signed up as a cooperating source.

19.     CS-5 provided law enforcement information regarding a Dominican male, whom CS-5 only knew as "Ricky," believed to be SOTO BAEZ. CS-5 explained that Ricky sold cocaine, crack cocaine, and fentanyl/heroin within the city of Manchester. CS-5 knew Ricky for two months and described their relationship as drug-related. According to CS-5,  Ricky answered the dispatch phone, identified by CS-5 as 603-512-5801. CS-5 also described a typical drug

transaction with Ricky, and stated thatCS-5 would contact Ricky, he would dispatch a runner to a meeting location, and the drug transaction would occur in the runner's vehicle.

20.      All information from CS-1, CS-2, CS-3, CS-4, and CS-5 that could be corroborated by agents has proven true and accurate. For example, agents confirmed historical information provided by the sources through open-source searches, social media searches, review of photographs, and review of police records.  To my knowledge, CS-1, CS-2, CS-3, CS-4, and CS-5 have never provided misleading or incorrect information to any law enforcement officer. For these reasons, I consider all involved confidential sources of information related to this investigation to be credible and reliable.

### Tax Assessor Information for Each of the SUBJECT PREMISES

21.      Investigators examined tax assessment records for each of the SUBJECT PREMISES in Boston, MA, but this examination yielded limited relevant information.  The listed owners of the SUBJECT PREMISES known to investigators are individuals and entities other than any of the target subjects of investigation.  Based on training and experience, I believe this indicates that the DTO members who reside at or otherwise occupy the SUBJECT PREMISES pay rent to these owners.  Based on my training and experience, I also know that drug traffickers will often provide monetary incentives to building owners for purposes of concealing their drug trafficking activity. Investigators did not attempt to contact these owners because doing so could result in the targets of investigation being alerted, in turn causing them to conceal evidence, change patterns of behavior, vacate the SUBJECT PREMISES, or otherwise hinder the investigation.

### SP-1: 21 Chamberlain St, 3rd Floor, Boston, MA

### Post-Arrest Interview Leading to Information about the DTO

12

22.     On May 19, 2022, an individual named Luis MALDONADO was arrested following a drug investigation investigated by MPD Special Enforcement Division (SED). At the time of the arrest, MALDONADO was in a vehicle operated by Alejandro REYES ROSADO. MALDONADO was read his Miranda rights, at which time he stated that he understood and waived his rights in order to answer questions from law enforcement.

23.     During the course of the post-arrest interview, MALDONADO provided investigators with relevant information about drug activity in and around the city of Manchester, NH. Additionally, MALDONADO said that he had recently been staying off and on in Dorchester, MA. He said that he lived at 23 Chamberlain St. in Dorchester (a neighborhood within Boston) on the top floor of a blue/green three-story apartment building. MALDONADO advised that there were two apartments on the top floor. He said that he and the driver of the vehicle that was stopped, REYES ROSADO, lived in one of the apartments.[1] MALDONADO stated that the other apartment at 23 Chamberlain St. was a stash pad where they would cook approximately 1 to 2 kilograms of cocaine per day into crack cocaine. MALDONADO stated that he was close with a group of 5 to 6 individuals for the past year or two that would move approximately 5 to 10 kilograms a week of crack cocaine into Manchester. MALDONADO advised that he was trying to turn his life around and was not selling a lot of product currently. MALDONADO was hesitant to provide any other information unless he had assurances regarding his charges. He also wanted the assurances because he was deeply afraid of the individuals he worked with. MALDONADO stated that if any of the individuals knew that he talked or gave information, he believed they would kill him.

---

[1] It should be noted that REYES ROSADO was arrested in Manchester, NH on December 28, 2021, for Disobeying an Officer (NH RSA 265:4). At the time of the arrest, REYES ROSADO indicated that he lived at 11 Chamberlain St. in Dorchester, MA.

**June 21, 2022 Surveillance at SP-1**

24.     On June 21, 2022, investigators traveled to the area of Chamberlain St. in Dorchester, MA following the recent MALDONADO interview indicating that the source of supply for illegal narcotics was coming from an address on this street. As investigators arrived in the area, they observed the following vehicle parked at the corner of Gaylord St and Chamberlain St: New Hampshire registration 5066226, 2006 Blue Cadillac SRX, VIN: 1GYEE637560129860 (hereafter, the "Cadillac").  Law enforcement officers subsequently obtained and executed a search warrant that authorized the installation of a GPS tracking device on the Cadillac. This vehicle had previously been observed by investigators in and around Manchester, NH conducting what appeared to be drug transactions.

25.     Shortly after initiating surveillance in the area, investigators observed a Hispanic male walk from the area of **SP-1** toward Washington St. This male was positively identified by investigators to be REYES ROSADO. He was observed walking to Sandy's Variety Store at 378 Washington St. When REYES ROSADO was observed leaving the store, he was holding a number of white and purple bags. Prior to the date of this observation, MPD had stopped and seized a vehicle that had been identified as being connected to this DTO. During the course of the search, investigators located a quantity of white and purple bags. The bags observed with REYES ROSADO were consistent with the white and purple bags located during the search warrant of the DTO vehicle, which had also revealed a "hide" that law enforcement believed to be used to store narcotics and other contraband. After REYES ROSADO was observed leaving the store, he was observed walking back to the area of **SP-1** and walked behind the address and out of sight.

26.     It should be noted that investigators noticed that **SP-1** matched the description

given by MALDONADO in the debrief referenced above, including but not limited to its

blue/green  color. Law enforcement also believes 21 Chamberlain St. (**SP-1**), and not 23

Chamberlain St., as MALDONADO had reported to law enforcement, is the correct address of

the property, based on surveillance confirming multiple members of the DTO coming and going

from 21 Chamberlain St., as further detailed below.

27.     Law enforcement believes the two apartments connected to MALDONADO and

REYES ROSADO, which are frequented by other members of the DTO, are the apartments on

the third floor of the apartment building at 21 Chamberlain St.  This is consistent with

MALDONADO's description of his and REYES ROSADO's apartment, and the other apartment

used to cook crack cocaine, being located on the "top" floor. Investigation has revealed that there

are only three mailboxes for 21 Chamberlain St., and the building is a three-story apartment

building. There is no indication that there are more than three floors inside of the building.

Therefore, the third floor is the "top" floor.

**June 23, 2022 Surveillance at SP-1**

28.     On June 23, 2022, investigators were conducting physical surveillance in the

area of **SP-1**. As investigators arrived in the area, they immediately observed the Cadillac parked

on Chamberlain St. in the area of **SP-1**. REYES ROSADO was observed exiting the area of **SP-1**

with a bag in his hand. He was observed walking around the street before going to the passenger

side of the Cadillac and then ultimately walked onto the front porch of **SP-1** and then walked

behind the address.

29.     A short time later, an individual associated with the DTO, Yefris CRUZ

ANDUJAR, was observed approaching the Cadillac. Previously that same month, CRUZ

ANDUJAR was in a vehicle with Hidequell GONZALEZ VIZCAINO, another target of

15

investigation. GONZALEZ VIZCAINO was arrested at the time for possession of a controlled drug—VIZCAINO had a sum of $1,629 in cash on his person, along with a clear plastic baggie containing powder believed to be heroin/fentanyl—and CRUZ ANDUJAR was arrested for transporting drugs. During the course of the arrest, the motor vehicle being operated by GONZALEZ VIZCAINO and CRUZ ANDUJAR was seized. A search warrant was subsequently executed on the vehicle, during which time investigators located purple bags consistent with the ones observed with REYES ROSADO from Sandy's Variety Store. Additionally, a mechanical hide was located inside of this vehicle, in which investigators located approximately 165.2 g of crack cocaine, 227.9 g of fentanyl, and 22.6 g of powder cocaine.

30.     When CRUZ ANDUJAR approached the Cadillac on June 23, 2022, he was holding keys. He then entered into the rear seat of the Cadillac, then exited and entered into the driver's seat. After some time, CRUZ ANDUJAR then exited the vehicle and walked down a driveway next to **SP-1**. He then reemerged and got into the driver's seat of the Cadillac and drove away from the area.

**July 19, 2022 Surveillance of Melissa Rey Ramos AKA Ralphie**

31.     On July 19, 2022, investigators observed a red 2020 Jeep Cherokee with MA registration 2ZTF21 driving and parking in the area of Hall St. and Belmont St. The vehicle was registered to Enterprise Rental and was operated by a heavier set Hispanic male who was later identified as DTO dispatcher "Ralphie," aka Melissa REY RAMOS, during a motor vehicle stop where Melissa REY RAMOS presented an ID to law enforcement.[2] . REY RAMOS was then observed exiting the Jeep and walking over to the Cadillac which was parked in the same area. Law enforcement observed REY RAMOS enterthe Cadillac and drive it to the area of Green St

---

[2] It is investigators' understanding that REY RAMOS is a biological female who identifies and presents as male.

by Belmont St. They observed REY RAMOS exit the Cadillac and meet up with DTO runner

Daniel BELDIN, who was driving another vehicle. REY RAMOS leaned over into the passenger

side of BELDIN'S vehicle for a short time and then BELDIN left the area. REY RAMOS then

entered back into the Jeep, when it was observed heading south toward Massachusetts before

ultimately arriving at **SP-1** at approximately 11:45 pm where REY RAMOS was observed

entering **SP-1**. REY RAMOS exited the apartment at 12:20 am and returned to the Jeep and left

the area.

### July 22, 2022 Electronic Surveillance at SP-1

32.     Based on previous observations in and around the area of **SP-1**, as well as the

difficulty in conducting physical surveillance at this address, a stationary electronic surveillance

platform was placed to allow law enforcement to observe the area around **SP-1**.

33.     On July 22, 2022, while monitoring the stationary electronic surveillance

platform, the aforementioned red Jeep Cherokee operated by RAMOS was observed arriving in

front of **SP-1**. REYES ROSADO was observed exiting the address and approaching the red Jeep

with a brown paper bag. REYES ROSADO put the brown paper bag through the passenger

window. The Jeep then left the area and REYES ROSADO returned to **SP-1**.

### December 28, 2022 Controlled Buy

34.     On December 28, 2022, at the direction of law enforcement, CS-1 placed a call

to a number which had previously been identified as being controlled by Antonio

AGUASVIVAS. AGUASVIVAS was identified as a dispatcher within this DTO. The purpose of

the phone call was for CS-1 to arrange the purchase of 10g of heroin/fentanyl. AGUASVIVAS

informed CS-1 that "Chino" was the driver that day and the deal was arranged for the area of

Ash St. and Webster St., where Chino would meet CS-1.

35.     Surveillance was then set in the area of Ash St. and Webster St., and after a short time, a Honda CRV was observed heading north on Ash St. from North St. This vehicle had previously been identified as a runner vehicle for this DTO. The Honda CRV was observed picking up CS-1 at the corner of Ash St. and Webster St. CS-1 entered into the front passenger seat. The CRV did a loop around the block before dropping CS-1 back off in the area of Ash St. and Webster St. where it then left the area.

36.     Once CS-1 returned to the investigators, CS-1 immediately provided two tied off plastic bags containing a tan substance believed by law enforcement based on its appearance to be heroin/fentanyl. The substance in the bags was later confirmed by state laboratory analysis to be 4.9 grams of fentanyl and 5.04 g of a fentanyl and tramadol mixture.

37.     Upon reviewing the audio and video footage from the controlled buy, investigators were able to identify the runner toas Dari Rafael BAEZ MARINEZ, aka "Chino." BAEZ MARINEZ appeared to be wearing a dark-colored jacket, green pants, and a dark-colored winter hat.

38.     Additionally, based on GPS tracker data of the Cadillac on this day, law enforcement reviewed stationary surveillance footage monitoring **SP-1**. At approximately 9:10 am, a male wearing a dark-colored jacket and black winter hat was observed exiting **SP-1**. This individual also appeared to be holding a plastic bag. He exited the address and walked to the Cadillac, which he then entered into, and the Cadillac proceeded out of camera view. The clothing of the male observed on the stationary camera appeared consistent with the clothes worn by BAEZ MARINEZ.

39.     Throughout the course of the investigation, investigators have learned through surveillance that runners will stop at **SP-1** in a certain vehicle and then drive to Manchester, NH

and proceed to get into another vehicle in order to conduct their transactions. They will periodically go back to the original "stash" vehicle throughout the day to resupply for additional transactions. It should be noted that on December 27, 2022, BAEZ MARINEZ was observed in the aforementioned Honda CRV. He was observed to pull up to the area of Cypress St. and Clay St. He exited the driver's seat of the CRV and entered into the driver's seat of the parked Cadillac for a short period of time before entering back into the CRV and driving away.

**January 12, 2023 Controlled Buy**

40.     On January 12, 2023, at the direction of law enforcement, CS-1 was instructed to place a call to the known DTO dispatcher AGUASVIVAS to order 10g of heroin/fentanyl. Once the call was made, CS-1 was able to confirm the voice of the male that answered was AGUASVIVAS; the two agreed on a price and meeting location of Ash St. and Webster St.

41.     Once the deal was set, surveillance arrived in the area, where investigators observed the Honda CRV pull onto Ash St. from North St. CS-1 entered into the CRV, which then did a quick loop around the block before dropping CS-1 off at the same location.

42.     CS-1 then was picked up by investigators and handed them two tied off plastic bags containing tan powder, which law enforcement believed to be heroin/fentanyl, and which was later weighed to be approximately 11 g and sent to the state lab for additional testing. Laboratory analysis confirmed that the substance was approximately 9.89 g of a fentanyl and tramadol mixture. CS-1 confirmed that BAEZ MARINEZ facilitated the transaction. He was wearing a blue puffy jacket and had a short beard.

43.     The stationary surveillance at **SP-1** was later reviewed in the time frame prior to this controlled buy. Investigators observed a male believed to be BAEZ MARINEZ exit **SP-1** and enter into the Cadillac. The male appeared to be wearing a dark colored jacket and a baseball

cap. The male then entered the Cadillac which then proceeded out of camera view.

44.     Additionally, the audio and video were reviewed from the buy which showed BAEZ MARINEZ wearing a blue puffy jacket, grey sweat pants, and a blue baseball cap which appeared consistent with the male observed earlier in the day leaving **SP-1**.

**May 3, 2023 Controlled Buy and Surveillance**

45.     On May 3, 2023, at the direction of law enforcement, CS-1 was instructed to set up a buy into the DTO lines being operated by AGUASVIVAS. CS-1 arranged the buy, which was set to occur in the area of Ash St. and Webster St.

46.     Surveillance units were able to identify a Honda CRV which was a known DTO runner vehicle. This vehicle was operated by BAEZ MARINEZ, who facilitated the buy. At the conclusion of the buy, CS-1 provided investigators with two tied off bags containing a tan powder believed by law enforcement to be heroin/fentanyl, and which later weighed out to approximately 10.7 g and was sent to the state lab for further testing.

47.     Earlier in the day, investigators were monitoring surveillance cameras on **SP-1** and observed an individual later identified as BAEZ MARINEZ exit **SP-1** and enter into the Cadillac. Utilizing the GPS tracker affixed to the Cadillac, the vehicle was followed directly to Manchester, NH where investigators were able to locate the vehicle and began following it. BAEZ MARINEZ parked the Cadillac in the area of Walnut St. and Blodgett St. before exiting and entering into the Honda CRV that was utilized during the controlled buy later on in the day.

**May 22, 2023 Surveillance of 21 Chamberlain St.**

48.     On May 22, 2023, investigators were monitoring surveillance camera footage of **SP-1**. At approximately 4:55 pm, a vehicle bearing MA registration 3KNN19 arrived at **SP-1**. A female and a young child walked toward the front of **SP-1**. Moments later, Flemin SOTO BAEZ

aka "CARLOS" followed them into **SP-1** while carrying a large box. Several minutes later, all three individuals exited **SP-1** and CARLOS did not have the box in hand. They all returned to the vehicle and approximately one minute later, all three returned to **SP-1**.

49.     The Cadillac had arrived at **SP-1** prior to CARLOS's arrival. At approximately 6:31pm, AGUASVIVAS exited the Cadillac with a plastic bag in his hand, which he then put into the bed of a pickup truck. He then appeared to be speaking on the phone and walked down the street before returning and removing the plastic bag from the bed of the truck and walking into **SP-1**. At approximately 6:52 pm, CARLOS, the female and the child exited **SP-1** and returned to the vehicle bearing MA registration 3KNN19 and left the area.

### SP-2: 15 Shepton St, Apartment 1, Boston, MA

### December 8, 2022 Controlled Buy into Osvaldo David SOTO JIMENEZ

50.     On December 8, 2022, CS-4 informed investigators of a new DTO dispatcher going by the name of "Tony" or "Peter." On this date, CS-4 was instructed to conduct a controlled purchase into the phone line being operated by "Tony." Once a deal was arranged for the purchase of $100 worth of crack cocaine, law enforcement took CS-4 to the area of the controlled buy at Cartier St. and Kelly St. Soon afterward, a red Ford Escape bearing NH registration 5100347 arrived in the area and ultimately facilitated the transaction. Later, CS-4 confirmed that "Tony" was the individual driving the Escape.

51.     After reviewing the audio and video recordings from the controlled buy, officers believed that Tony matched the appearance of a known individual with prior MPD contacts: Osvaldo David SOTO JIMENEZ. On December 13, 2023, a photo line-up was conducted with CS-4. Eight photos were selected that all contained individuals with similar physical characteristics to SOTO JIMENEZ. Upon reviewing the line-up, CS-4 identified Tony to be

SOTO JIMENEZ with 100% certainty.

**December 23, 2022 Surveillance**

52.     On December 23, 2022, investigators were monitoring a GPS tracker affixed to a black Ford Edge, which had been identified as a stash vehicle for this DTO. On this morning, the Edge was observed leaving the area of 15 Shepton St. (the address of **SP-2)**. The vehicle was then observed traveling north on I-93 into Manchester, NH. Physical surveillance was able to locate the Edge in the area of Myrtle St. and Pine St. As the vehicle stopped in that area, surveillance observed a known DTO runner, Daniel BELDIN, enter into the front passenger seat of the Edge. BELDIN exited the vehicle after a short period of time and then proceeded to head north on Pine St. while the Edge was observed leaving the area.  In my training and experience, individuals engaged with others in dealing narcotics will sometimes meet with others in vehicles to pick up the narcotics to be distributed, or conduct drug transactions in vehicles.  I believe based on my training and experience that BELDIN was receiving drugs to be distributed during his time in the Edge.

53.     The Edge was then observed traveling in the area of Second St. and Walker St., where it ultimately parked. At the same time, surveillance also observed a Hyundai Sonata, which had previously been identified as another DTO vehicle, parked in the rear of 146 Second St. As surveillance located the Sonata, investigators observed known DTO member Gabriel HERNANDEZ leaning into the front driver's side of the Sonata. HERNANDEZ was then observed walking to the rear of 146 Second St. before a visual was lost on him.

54.     After about a minute, HERNANDEZ re-emerged from 146 Second St and entered into the Sonata and drove a short distance before parking on Third St. HERNANDEZ then exited the vehicle and entered into a parked black Ford Escape. After approximately two minutes, he

exited the Escape and got back into the Sonata which then left the area.  Based on my training

and experience and knowledge of the investigation, I believe that the above observations show

that HERNANDEZ was picking up product from a "stash car" in Manchester.

**January 4, 2023 Surveillance**

55.     On January 4, 2023, investigators were conducting surveillance on the Escape. As

this vehicle traveled around Manchester, I positively identified the driver of this vehicle as

SOTO JIMENEZ (I knew his appearance based on the prior identification made by investigators

described previously in this Affidavit). At one point during that day, SOTO JIMENEZ met with

HERNANDEZ in the Sonata. SOTO JIMENEZ and HERNANDEZ spoke for a short time before

both departed separately.

56.     Investigators had previously obtained a warrant for real-time location data for the

phone assigned 603-222-4047, which was believed to be used by SOTO JIMENEZ. Ping data

showed the phone to be in the area of Marion St. in Goffstown, NH. Surveillance units traveled

to this area, where they ultimately located the Escape parked in the driveway of 44 Higgins St.

57.     Surveillance was maintained on the vehicle as it traveled through Manchester and

ultimately south on I-93 toward Boston. The Escape parked in the area of Talbot St. and Millet

St. (the area of **SP-3**) in Dorchester. SOTO JIMENEZ exited the Escape and walked to the back

of the Edge, which had been previously parked there. SOTO JIMENEZ stood there for a period

of time before ultimately traveling out of the area in the Escape.

58.     Surveillance was set up in the area of **SP-2** and at approximately 9:02 pm,

surveillance units observed the Escape traveling into the area. Moments later, SOTO JIMENEZ

was observed walking toward the front of **SP-2** carrying a large trash bag. A motion light

activated on the porch of **SP-2**, whereafter SOTO JIMENEZ was no longer visible. No other foot

traffic was observed in the area of **SP-2** at this time.

### January 12, 2023 Surveillance/Controlled Buy

59.     On January 12, 2023, investigators conducted physical surveillance at **SP-2**. At approximately 7:00 am, a maroon Chevrolet Impala bearing NH registration 5189596 was observed parked in front of **SP-2**.

60.     Later in the day, investigators conducted a buy-walk operation that involved arranging a transaction by calling a DTO dispatch phone believed to be operated by Angel Leonel FUENTES PIZARRO, SOTO BAEZ, and/or SOTO JIMENEZ. CS-2 was instructed to call this dispatch phone number. A deal was arranged for the purchase of $400 worth of crack cocaine. CS-2 placed the phone call and was directed to the area of 150 Brook St. in Manchester, NH.

61.     Surveillance was set in the area of 150 Brook St. and law enforcement transported CS-2 to the area. Moments after surveillance was set, investigators observed the Impala previously observed earlier in the morning at **SP-2**, parked on Beech St. just north of Brook St.

62.     A short time later, the Impala was observed pulling away from the curb and ultimately picking up CS-2. The Impala traveled a short distance before turning around and dropping CS-2 back off in the area where CS-2 had originally been picked up.

63.     Surveillance units could observe the driver of the Impala to be known DTO member HERNANDEZ. The Impala left the area after dropping CS-2 back off.

64.     CS-2 then met with investigators and handed them four clear cellophane bags tied at the end by a knot. Each bag contained a white chunk like substance which later weighed out to approximately 7.8 g and field tested presumptive positive for cocaine base. These drugs were sent to the state lab for additional testing.

**January 26, 2023 Surveillance**

65.     On January 26, 2023, investigators were monitoring a GPS tracking device affixed to the Edge. At approximately 9:12 pm, the vehicle was observed stopping in the area of **SP-2**. It then left again at approximately 12:55 am and traveled to Randolph, MA.

66.     Reviewing the stationary surveillance platform monitoring **SP-2** during the time the Edge arrived, investigators observed a male exit the vehicle and retrieve something from the passenger seat and then walk toward the front door of **SP-2**. The male then exited **SP-2** at approximately 12:52 am and returned to the Edge.

67.     On January 27, 2023, at 9:05am the Edge was observed on the GPS tracking device coming north toward Manchester, NH. Physical surveillance located the vehicle in the area of Taylor St. and Somerville St., where investigators observed HERNANDEZ exit the vehicle and enter into the Impala.

**January 30, 2023 Controlled Buy**

68.     On January 30, 2023, at the direction of law enforcement, CS-2 was instructed to place a phone call into a known DTO dispatch line in an attempt to purchase $400 worth of crack cocaine. CS-2 placed the phone call and was directed to the area of 150 Brook St, Manchester, NH.

69.     Prior to this deal, using the stationary electronic surveillance platform, investigators observed HERNANDEZ exit **SP-2** and enter into the Edge. The Edge was then monitored via GPS tracking device and observed traveling to Manchester, NH. HERNANDEZ was identified as the sole occupant of the Edge. Additionally, according to the GPS tracker data, the vehicle arrived in Manchester at approximately 10:24am. According to the GPS tracker data, the vehicle appeared to make numerous, frequent stops throughout the city prior to the controlled

drug buy, which occurred at approximately 5:50 pm. Based on my training and experience, I believe this driving behavior is consistent with HERNANDEZ conducting drug transactions throughout the city.

70.     During the deal, shortly after surveillance was set in the area of 150 Brook St., the Edge driven by HERNANDEZ was observed in the area. The Edge then stopped and picked up CS-2 before traveling a short distance around the block and returning and dropping off CS-2.

71.     CS-2 then met with investigators and provided them with four clear cellophane bags tied at the end by a knot which each contained a white chunk like substance, which law enforcement believed to be crack cocaine. This substance was later weighed to be approximately 7.7g and field-tested presumptively positive for cocaine base.

72.     Electronic surveillance on the Edge was continuously monitored following the controlled buy. The Edge left Manchester, NH and proceeded south on I-93 where it was picked up by physical surveillance in Salem, NH at approximately 9:06pm. It should be noted that upon leaving Manchester, it did not make any stops before being picked up by physical surveillance.

73.     Surveillance was maintained on the Edge as it traveled to the area of **SP-2**. After the car parked, HERNANDEZ was observed via surveillance footage entering into the front door of **SP-2** at approximately 9:58pm.

**May 12, 2023 Surveillance**

74.     On the morning of May 12, 2023, physical surveillance was established in the area of **SP-2**. DTO member HERNANDEZ was observed exiting the front door of **SP-2** and getting into the previously identified Ford Edge.

75.     HERNANDEZ then traveled to **SP-4** (11 Abbott St. in Dorchester, MA). HERNANDEZ parked the vehicle in front of the residence at **SP-4**, where he was observed

walking up to the front door and pressing one of the doorbells. After a short time, he was observed being buzzed into the building. A few minutes later, HERNANDEZ exited and then appeared as if he had forgotten something inside of the residence. He then pressed the doorbell again and was once again allowed inside. He then exited the address after a few minutes and entered back into the Edge. HERNANDEZ was followed from **SP-4** going directly to Manchester, NH.

76.     As HERNANDEZ entered Manchester, he traveled to an auto body shop at the corner of Wilson St. and Silver St. This auto body shop was previously known to be associated with this DTO as multiple DTO vehicles had been observed parked in the garage, on the street in front of the garage, or near the shop. HERNANDEZ pulled on to Wilson St where he was then observed exiting his vehicle and speaking with one of the mechanics.

77.     Shortly afterwards, the Cadillac was observed pulling up to the shop, where BAEZ MARINEZ was observed exiting the Cadillac and going to speak with HERNANDEZ. After a brief conversation, both entered back into their respective vehicles and went their separate ways.

78.     HERNANDEZ was then observed going to 425 Hall St, Manchester, NH, which had been identified as a location where DTO members wire money via a cash remittance service called Ria Money Transfer.

79.     While HERNANDEZ was inside of 425 Hall St, at the direction of law enforcement, CS-2 was instructed to call a known DTO dispatch line in order to set up a controlled purchase. A short time later, CS-2 received a call back from the DTO dispatcher who made a statement to the effect of "the detectives are following my guys, I need time, so I'm not going to meet you right now." HERNANDEZ was then observed, at approximately 11:23 am,

exiting 425 Hall St. with an unknown female who entered into the Edge and parked it in the area of 150 Wilson St. Both exited the vehicle and did not return. A short time later, CS-2 met back with investigators to attempt to set the controlled purchase up again. The phone call was successful, and CS-2 was instructed to return to the same area where the first buy had occurred. At this time, an unknown runner arrived in the maroon Chevrolet Impala to facilitate the transaction.

80.     Fixed surveillance recordings of **SP-2** were later reviewed which showed HERNANDEZ entering back into **SP-2** at approximately 1:54 pm.

**Utilities Information**

81.     Investigators sent a subpoena to Eversource Residential Energy in order to obtain names of individuals receiving services at each apartment in **SP-2**. Eversource returned results for an individual with the name Raymond SOLER JR in Apartment 1 of **SP-2**, which had been receiving services since August 25, 2022. Investigators had previously located a Facebook profile for known DTO dispatcher Osvaldo David SOTO JIMENEZ, described above, with the name "Raymond Soler." This profile includes a picture that shows SOTO JIMENEZ standing on the front porch of what appears to be **SP-2**.

82.     Based on the multiple aliases utilized by SOTO JIMENEZ, investigators believe that a search of **SP-2** will yield records relating to and revealing the true identity of, as well as the aliases associated with, SOTO JIMENEZ and other DTO members believed to be residing at this location.

### SP-3: 98 Millet St, Apartment 1, Boston, MA

**Intelligence and Controlled Purchases of Crack Cocaine from CARLOS's Team**

83.     On July 14, 2022, MPD investigators utilized CS-3 in order to make a controlled

purchase of a quantity of crack cocaine from "CARLOS" (Flemin SOTO BAEZ). During this

transaction, CS-3 communicated with CARLOS utilizing the primary dispatch telephone

number, 603-377-6466, arranging for the purchase of a quantity of crack cocaine in exchange for

a sum of money. Once a deal was reached, CS-3 was directed to an area where CS-3 met with

ARIAS MEJIA, otherwise known as "Manny," who completed the deal on behalf of CARLOS.

84.     On July 19, 2022, MPD investigators utilized CS-3 in order to make a controlled

purchase of a quantity of crack cocaine from CARLOS. During this transaction, CS-3

communicated with CARLOS utilizing the primary dispatch telephone number, 603-377-6466.

CARLOS instructed CS-3 to contact ARIAS MEJIA directly in order to complete this purchase,

which CS-3 did. ARIAS MEJIA's telephone number was identified as 603-858-8766. CS-3

communicated with ARIAS MEJIA, and arranged and later completed a controlled purchase of a

quantity of crack cocaine in exchange for a sum of money.

85.     On July 26, 2022, investigators with the Manchester Police Department utilized

CS-3 in order to make a controlled purchase of a quantity of crack cocaine from CARLOS.

During this transaction, CS-3 communicated with CARLOS utilizing the primary dispatch

telephone number 603-377-6466, arranging for the purchase of a quantity of crack cocaine in

exchange for a sum of money. Once a deal was brokered, CS-3 was directed to an area where

CS-3 met with ARIAS MEJIA, who completed the deal on behalf of CARLOS.

86.     On July 28, 2022, CS-3 provided information learned from an acquaintance, who

had information relating to this DTO. This acquaintance informed CS-3 that CARLOS was part

of a larger criminal organization along with an unknown male utilizing the alias of "Angel," who

had since moved to Florida but was believed to be the leader of this DTO. Based on information

known to investigators, it is believed that the "Angel" referenced is different than the "Angel" referenced and later identified as being a Lieutenant within this DTO, Angel FUENTES PIZARRO. Previous intelligence has identified "Ricky" (Juan SOTO BAEZ) as utilizing several aliases in an effort to mask his identity to avoid positive identification and apprehension.

87.     On August 2, 2022, investigators with the Manchester Police Department utilized CS-3 in order to make a controlled purchase of a quantity of crack cocaine from CARLOS. During this transaction, CS-3 communicated with CARLOS utilizing the primary dispatch telephone number, 603-377-6466, arranging for the purchase of a quantity of crack cocaine in exchange for a sum of money. Once a deal was arranged, CS-3 was directed to an area where CS-3 met with ARIAS MEJIA, who completed the deal on behalf of CARLOS.

88.     On August 22, 2022, investigators with the Manchester Police Department again utilized CS-3 in order to make a controlled purchase of a quantity of crack cocaine from CARLOS. During this transaction, CS-3 communicated with CARLOS utilizing the primary dispatch telephone number, 603-377-6466, arranging for the purchase of a quantity of crack cocaine in exchange for a sum of money. Once a deal was brokered, CS-3 was directed to an area where CS-3 met with "John," believed to be CORDERO ORTIZ, who completed the deal on behalf of CARLOS.

89.     On September 15, 2022, investigators with the Manchester Police Department again utilized CS-3 in order to make a controlled purchase of a quantity of crack cocaine from CARLOS. During this transactions, CS-3 initially communicated with an unknown female utilizing the primary dispatch number, 603-377-6466, and later spoke with CARLOS arranging for the purchase of a quantity of crack cocaine in exchange for a sum of money. Once a deal was brokered, CS-3 was directed to an area where CS-3 met with the runner "Joseph," identified by

law enforcement as Jhonattan ARIAS JIMENEZ, who completed the deal on behalf of

CARLOS.

90.     On September 29, 2022, law enforcement sought two warrants in the District of

New Hampshire – one for historical and prospective information associated with the cellular

phone assigned call number 603-377-6466 and another for use of a cell-site simulator to locate

the cellular device assigned call number 603-377-6466 and other cellular devices carried by

CARLOS. A United States Magistrate Judge signed and authorized both warrants that day. The

warrants were served to the cellular service provider, T-Mobile, and on September 30, 2022,

investigators began receiving cellular ping data from the service provider. The location

information obtained from the warrant for historical and prospective cell site data assisted agents

with obtaining a general location for CARLOS. The data showed the phone primarily being used

within the Commonwealth of Massachusetts and primarily in the Boston, Massachusetts area. On

October 18, 2022, law enforcement sought an additional cell-site simulator warrant for the

District of Massachusetts. A United States Magistrate Judge for the District of Massachusetts

signed and approved the warrant on the same day.

91.     On October 4, 2022, members of the Manchester Police Department met with CS-

3 in an effort to make a controlled purchase of a quantity of crack cocaine from CARLOS. CS-3

communicated with CARLOS, utilizing CARLOS' primary dispatch number 603-377-6466 and

arranged the purchase of a quantity of crack cocaine in exchange for a sum of money. Once the

deal was brokered, CS-3 was directed to an area where CS-3 met with a runner identified only as

"Big Man," who completed the deal on behalf of CARLOS.

92.     On October 19, 2022, law enforcement investigators executed the warrant and

received information that the cellular device assigned call number 603-377-6466 was in the area

of **SP-3**, Dorchester, Massachusetts. Ping data showed that the unique identifiers of the cellular device emitted directly from **SP-3** during the operation. An unknown male was seen exiting apartment #1, and would return to the apartment. The same unknown male was seen outside the apartment later in the operation. The male was carrying a cellular device in his hands. The cell-site simulator was utilized and showed the cellular device assigned call number 603-377-6466 zero meters away from the simulator. The unknown male later reentered apartment one.

93.     On November 3, 2022, investigators observed CARLOS exit and enter apartment #1 of 98 Millet St. (**SP-3**) during the operation. A ruse text was sent to 603-377-6466 and law enforcement observed CARLOS look at a phone he was carrying at that time directly after the ruse text was sent. CARLOS was also seen interacting with an unknown person who arrived to **SP-3**.

94.     On November 16, 2022, investigators utilized a cell-site simulator in close proximity to **SP-3** during nighttime hours. The unique identifiers of cellular device assigned call number 603-377-6466 emitted directly from 98 Millet St. The signals were believed to have emanated from apartment #1.

95.     On November 17, 2022, detectives with the Manchester Police Department met with CS-3 for the purpose of making a controlled purchase of a quantity of crack cocaine from CARLOS. CS-3 communicated with CARLOS, utilizing CARLOS' primary dispatch number 603-377-6466 and arranged a purchase of a quantity of crack cocaine in exchange for a sum of money. Once a deal was brokered, CS-3 was directed to an area where CS-3 met with "Big Man," who completed the deal on behalf of CARLOS.

96.     On January 12, 2023, Manchester Police investigators met with CS-3 for the purpose of making a controlled purchase from CARLOS. CS-3 contacted CARLOS, utilizing

CARLOS' primary dispatch number 603-377-6466 and arranged the purchase of a quantity of crack cocaine in exchange for a sum of money. Once a deal was brokered, CS-3 was directed to an area and met with "Angel," whom investigators have identified as Angel FUENTES PIZARRO during the course of the investigation. Angel completed the crack cocaine transaction on behalf of CARLOS.

97.     On February 20, 2023, members of the Manchester Police Department met with CS-3 for the purposes of making a controlled crack cocaine purchase from CARLOS. CS-3 contacted CARLOS, utilizing the primary dispatch phone number 603-377-6466 and arranged the purchase of a quantity of crack cocaine in exchange for a sum of money. Once the deal was brokered, CS-3 was directed to an area and met FUENTES PIZARRO and "Big Man," who both completed the drug transaction on behalf of CARLOS.

98.     On March 7, 2023, investigators with the Manchester Police Department met with CS-3 for the purpose of making a controlled crack cocaine purchase from CARLOS. CS-3 contacted CARLOS with a new primary dispatch phone number, identified by CS-3 as 603-858-8766 and arranged the purchase of a quantity of crack cocaine in exchange for a sum of money. Once the deal was brokered, CS-3 met with "Jesus," believed by investigators to be another alias for FUENTES PIZARRO, who completed the deal on behalf of CARLOS.

99.     On April 12, 2023, Manchester Police Department investigators were conducting surveillance in the area of **SP-3** as part of this investigation. Surveillance observed CARLOS through the window of apartment one. Surveillance also observed a Nissan Rogue bearing New Hampshire registration 5132808 parked and running in front of **SP-3**. Investigators have identified the Rogue as being utilized by the DTO.

100.     Based on the multiple aliases utilized by CARLOS aka Flemin SOTO BAEZ,
investigators believe that a search of **SP-3** will yield records relating to and revealing the true
identity of, as well as the aliases associated with, CARLOS and other DTO members believed to
be residing at this location or otherwise on the premises.

### 11 Abbot St., Apartment 1, Boston, MA

**Intelligence and Physical Surveillance**

101.     On April 14, 2023, an MPD officer located a known DTO vehicle, the Red Ford
Escape bearing Maine registration 967ZP.[3] The officer identified the driver of this vehicle to be
Juan Ramon SOTO BAEZ. After observing motor vehicle violations, an officer conducted a
motor vehicle stop on this vehicle. When the officer made contact with the driver, the driver
produced a Florida identification card identifying himself to be Wilfredo Hernandez Rosario.

102.     It should be noted that that SOTO BAEZ has used multiple aliases over the years.
Despite this, the individual identifying himself to be Wilfredo Hernandez Rosario was identified
by investigators to be SOTO BAEZ.

103.     After the motor vehicle stop was concluded and SOTO BAEZ was released, the
vehicle drove away, and physical surveillance was conducted on this vehicle. The vehicle made
multiple stops in Manchester, NH before ultimately going back to **SP-4**.

104.     Surveillance was able to follow SOTO BAEZ to **SP-4** where he was observed
exiting the vehicle and walking into the front door of **SP-4**. Sometime after he was observed
entering into **SP-4**, he was observed exiting the residence and returning to the vehicle where he

---

[3] This vehicle previously bore NH registration 5100347. Additionally, investigators had
previously observed FUENTES PIZARRO operating this vehicle while engaging in behavior
consistent with drug activity. Furthermore, on December 8, 2022, investigators conducted a
controlled buy-walk operation into this DTO where Osvaldo David SOTO JIMENEZ drove this
vehicle to conduct this drug transaction.

traveled to Carney Hospital in Dorchester, MA and surveillance was concluded.

105.    On April 17, 2023, MPD detectives met with CS-4. CS-4 spoke about meeting "Toni," also known to the CS as "Ricky" on April 14, 2023,the day SOTO BAEZ was observed making multiple stops in Manchester after being pulled over during the motor vehicle stop.

106.    CS-4 contacted 603-512-5801 and ordered a small quantity of crack cocaine from Toni, also known to the CS as "Ricky." CS-4 arranged for the meeting to occur at 341 Hanover Street. Thereafter, a Hispanic male arrived at that address and said "do you remember me from Dutton Street? Ricky." Although the male identified himself as "Ricky," he also referred to himself as "Toni." CS-4 said Ricky was the same person CS-4 spoke to on 603-512-5801 to arrange the meeting.

107.    Ricky asked CS-4 for more drug customers. CS-4 said Ricky was only at 341 Hanover St. for approximately five minutes, and during their time together, Ricky provided CS-4 with a quantity of crack cocaine. Based upon the observations of investigators and the statements made by CS-4, detectives believed CS-4 met with SOTO BAEZ. CS-4 was counseled by investigators regarding the uncontrolled crack cocaine transaction.

**May 19, 2023 Surveillance and Controlled Buy**

108.    On May 19, 2023, at approximately 8:24am investigators were conducting surveillance in the area of **SP-2** when they observed a Hispanic male exit the front door of **SP-2** and enter into a Subaru Legacy bearing NH registration 5170015. This vehicle left the area where it was followed to **SP-4** where it was observed parking directly in front of the building. The same Hispanic male observed leaving **SP-2** exited the driver's seat of the Subaru and entered into the front door of **SP-4**. MPD Sgt Joyal was able to gain access to **SP-4** through an open common area door in the rear of the building. At approximately 8:45am Sgt Joyal was able

to observe the male exit Apartment 1, and proceed back to his vehicle. The vehicle then was followed as it traveled directly to Manchester, NH where it parked in the area of Spruce St and Clough St. The Hispanic male was observed sitting in his car without exiting. No other individuals were observed coming or going from the vehicle. Additionally, investigators had been monitoring court-authorized pings on DTO dispatch phone line 603-512-5801. As physical surveillance followed this Hispanic male from **SP-4** directly to Manchester, the dispatch phone had been turned off and no ping data was being transmitted. As this Hispanic male was sitting in his car in Manchester the phone appeared to have then turned on and began sending ping data at approximately 10:34 am. Shortly after the phone turned on, the Hispanic male then drove away from the area, indicating he was likely receiving deliveries from the dispatch line after the dispatch phone was turned on.

109.    The Subaru was observed traveling to the area of 341 Hanover St., where it parked and the Hispanic male exited the vehicle and entered into 453 Maple St # 8. MPD Detectives have contacts with the individuals associated with this apartment and know them to be drug users. After a short time, the Hispanic male exited the address and returned to his vehicle. Through their training and experience, investigators believed the Hispanic male to be conducting drug transactions.

110.    On the same date, CS-5 was instructed to place a phone call into known DTO dispatch line 603-512-5801in order to set up a drug transaction. A male answered the phone and directed CS-5 to the area of 700 Belmont St, Manchester, NH.

111.    Surveillance was established in the area of 700 Belmont St prior to CS-5 being followed into the area. Moments after CS-5 pulled into the area, the aforementioned Subaru pulled in front of CS-5's vehicle. CS-5 exited CS-5's vehicle and immediately entered into the

front seat of the Subaru. After approximately one minute, CS-5 was observed exiting the front seat of the Subaru and returning to CS-5's vehicle.

112.    CS-5 then met with investigators where CS-5 immediately provided them with three tied off bags containing a tan substance believed to be heroin/ fentanyl. This later weighed out to approximately 2 g and was later sent to the state lab for additional testing. CS-5 advised when they entered the Subaru, they asked for $100 worth of heroin/fentanyl. The Hispanic male retrieved the three bags from a cup that was located in the center console.

113.    When investigators reviewed the audio and video footage from the controlled buy they confirmed it was the same Hispanic male they observed exit **SP-2** and drive to **SP-4** earlier in the day.

114.    Based on the multiple aliases utilized by SOTO BAEZ aka Nicholas LOPEZ ROSADO aka Wilfredo HERNANDEZ, investigators believe that a search of **SP-4** will yield records relating to and revealing the true identity of, as well as the aliases associated with, SOTO BAEZ and other DTO members believed to be residing at this location or otherwise on the premises.

## 7 Everett Ave, Apartment 1, Boston, MA

**Angel Leonel FUENTES PIZARRO Identification**

115.    On July 15, 2022, investigators observed a known drug user walking south on Belmont St. The week prior to this, Katie GIRGUS, who was a known runner for DTO dispatcher Melissa REY RAMOS, was observed conducting a hand-to-hand drug transaction with this known drug user. This individual was observed getting into the front passenger seat of a red Ford Escape bearing NH registration 5100347 and then exiting after approximately 30 seconds. Based on training and experience this was believed to be a drug transaction.

116.    The Escape then traveled to an auto body shop where it parked near another known DTO vehicle. After a short time, the Escape left the area of the auto body shop and was observed committing a motor vehicle violation. A Manchester police officer thereby conducted a motor vehicle stop of the Escape. The driver of the Escape produced a Massachusetts's driver's license (SA0980254) with the name Angel Leonel FUENTES PIZARRO; DOB 2/24/1981; 7 Everett Ave, Apartment S1, Dorchester, MA. It should be noted that later in the investigation, social media profiles were located for FUENTES PIZARRO with an alternative name of "ERISON JIMENEZ". Additionally, in reference to FUENTES PIZARRO's listed address of apartment S1, according to the city of Boston's Tax Assessor website, it appears that 7 Everett only contains three distinct apartments: 1, 2, and 3, not "S1." FUENTES PIZARRO was released with a warning after the motor vehicle stop.

117.    Later on that day, investigators met with CS-2 who advised them that they knew that "ANGEL" (FUENTES PIZARRO) was driving this vehicle and that CS-2 had spoken with FUENTES PIZARRO before. During that time, he had introduced himself as "ANGEL" and said that he was the one that answered the phone when CS-2 called to order product. On one occasion CS-2 knew that ANGEL was the one that arrived to deliver the product.

**Fuentes Pizarro Money Transfer to Wilfredo Hernandez**

118.    DEA analysts were conducting research on the name provided by SOTO BAEZ on the April 14, 2023, motor vehicle stop in Manchester: Wilfredo HERNANDEZ. During their research they identified several phone numbers associated with HERNANDEZ to include 781-441-9030. When this number was checked through the Southwestern Border Trac database, DEA analysts identified money transfers associated with this number. On November 27, 2022, FUENTES PIZARRO sent $900 to HERNANDEZ. The money transfer included the following

identifying information for FUENTES PIZARRO; Phone number: 603-852-911; Address: 7

Everett Ave, Dorchester, MA (**SP-5**), MA Driver's License number: SA0980254. This was the

same driver license number provided to MPD on the July 15, 2022 motor vehicle stop.

**Ping Warrant & Cell Site Simulator Warrant**

119.    On May 5, 2023, law enforcement obtained a warrant in the District of New

Hampshire for historical and prospective location information associated with the DTO dispatch

cellular phone assigned call number 603-512-5801. This phone was believed to be carried by

SOTO BAEZ. On May 9, 2023, law enforcement began receiving cellular ping data from T-

Mobile. This data showed the phone was being operated in and around the Commonwealth of

Massachusetts, primarily in the Boston area. Additionally, many of these pings were originating

from the area of **SP-5**. On May 30, 2023, this phone continued to ping in the immediate area of

**SP-5**.

120.    On May 19, 2023, law enforcement obtained an additional search warrant from

the District of New Hampshire to utilize a cell-site simulator in attempts to locate the dispatch

phone ending in 5801. On May 23, 2023, investigators executed this cell-site simulator warrant.

Ultimately, the phone was located at **SP-5**. Physical surveillance observed several known DTO

vehicles parked in the back of **SP-5** and on the street near **SP-5**. Additionally, another known

DTO vehicle arrived in front of **SP-5** and left after a short period of time. The driver of this

vehicle was positively identified as SOTO BAEZ. After SOTO BAEZ left the area, the cell-site

simulator confirmed the target phone was still at **SP-5**. This is common in that these dispatch

phones are often operated by multiple individuals within the organization.

121.    Based on the multiple aliases utilized by FUENTES PIZARRO aka ERISON

JIMENEZ, investigators believe that a search of **SP-5** will yield records relating to and revealing

the true identity of, as well as the aliases associated with, FUENTES PIZARRO and other DTO

members believed to be residing at this location or otherwise on the premises.

**TRAINING AND EXPERIENCE SUPPORTING PROBABLE CAUSE THAT THE ITEMS TO
BE SEIZED WILL BE FOUND ON THE SUBJECT PREMISES**

122.    Based upon my training and experience, as well as the collective knowledge and

experience of other agents and law enforcement officers, I am aware that drug traffickers very

often store controlled substances and tools of the drug trade in their homes, automobiles, garages

or outbuildings on their properties, basements, or other places under their immediate control. I

am aware that it is generally a common practice for drug traffickers to store their drug inventory

and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping

material, paper or plastic bundles, and zip lock bags, in residences or other locations they access

with frequency.

123.    Based on my training and experience, powder drugs such as fentanyl and cocaine

are generally brought into the region in bulk. However, such drugs are not typically consumed by

users in such high purity form. Rather, such powder drugs, when ultimately consumed by the

user, are at a lower purity level. High purity powder drugs are reduced in purity by the addition

of dilutants. This process is called "cutting" or "stepping on" the drug. Other equipment, such as

scales, presses, grinders, razor blades, glass panes, blenders, and mirrors, and the like are

typically used in this cutting process. Once the drug has been "cut," a usual practice is to

repackage or "press" it in smaller quantities such as ten gram fingers or other types of plastic

bags for redistribution.

124.    It is generally a common practice for drug traffickers to maintain in hard copy or

on other electronic devices, records relating to their drug trafficking activities. Because drug

traffickers in many instances will "front" (that is, sell on consignment) controlled substances to

40

their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

125.    Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

126.    Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

127.    It is also a generally common practice for traffickers to conceal at their residences, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

128.    Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that

drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

129.    Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and U.S. currency are often located in a residence or on an individual's person.

130.    Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

131.    It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

132.    I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

133.    In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles,

residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

134.    As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

135.    In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based

on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

136.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.

137.    This warrant application does not seek authorization to search the contents of electronic devices, computers, or phones in the SUBJECT PREMISES at this time, but rather, to seize such items pending application for a subsequent search warrant.  Law enforcement officers and agents executing this warrant will endeavor to search for and seize only the phones, electronic devices, and computers which, upon reasonable inspection and/or investigation conducted during the execution of the search, are reasonably believed to contain the evidence in Attachment B because they appear to be associated with (that is, used by or belong to) individuals named in this Affidavit (i.e., targets of investigation suspected of having committed one or more of the Target Offenses) and any persons believed by law enforcement to be their co-conspirators.

## PERSONS TO BE ARRESTED

138.    On April 26, 2023, a federal grand jury in the District of New Hampshire returned an indictment charging each of the individuals with capitalized names previously mentioned in this Affidavit—namely, Juan Ramon SOTO BAEZ, Flemin SOTO BAEZ, Osvaldo David SOTO JIMENEZ, Angel Leonel FUENTES PIZARRO, Antonio AGUASVIVAS, Alejandro REYES

ROSADO, Luis MALDONADO, Melissa REY RAMOS, Gabriel HERNANDEZ, Victor

ARIAS MEJIA, Jose CORDERO ORTIZ, Jhonattan ARIAS JIMENEZ, Yefris CRUZ

ANDUJAR, Hidequell VIZCAINO, Daniel BELDIN, Katie GIRGUS, Dari Rafael BAEZ

MARINEZ—as well as other of their co-conspirators not previously named in this Affidavit

(specifically, Leander Jose RIVERA SOTO, Nickolas STARKEY, Maria CAMACHO, and

Alesha NEAULT) with conspiracy to distribute controlled substances, in violation of 21 U.S.C.

§§ 841(a)(1) and 846. Accordingly, an arrest warrant was issued for each of these individuals.

None of these arrest warrants have yet been executed.  Based on these named individuals'

respective connections with the SUBJECT PREMISES, there is probable cause to believe that a

search of each of the SUBJECT PREMISES will assist in locating one or more persons to be

arrested.

**CONCLUSION**

139.    For all the reasons described above, I submit that there is probable cause to believe that evidence, instrumentalities, and fruits of the violations of the Target Offenses, further described in Attachment B, will be found by searching the SUBJECT PREMISES described in Attachments A-1, A-2, A-3, A-4, and A-5.


Michael McGee
Task Force Officer
Federal Bureau of Investigation


Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on **Jun 2, 2023**

HON. JUDITH G. DEIN
United States Magistrate Judge